IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| NANETTE MASON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 2:20-cv-02484-SHM-atc |
| | ) | |
| FEDERAL EXPRESS CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**ORDER DENYING NANETTE MASON'S MOTION FOR SUMMARY JUDGMENT ON THE ADMINISTRATIVE RECORD AND GRANTING FEDERAL EXPRESS CORPORATION'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Nanette Mason ("Mason") seeks to recover short-term disability ("STD") benefits under a policy provided to her by Defendant Federal Express Corporation ("FedEx"). (D.E. No. 1.) Before the Court are two motions. The first is Mason's February 8, 2021 Motion for Summary Judgment on the Administrative Record. (D.E. No. 18.) FedEx responded on March 17, 2021. (D.E. No. 22.) The second is FedEx's February 9, 2021 Motion for Summary Judgment. (D.E. No. 19.) Mason did not file a response. Mason's motion for summary judgment is **DENIED.** FedEx's motion for summary judgment is **GRANTED.**

I.    **Background**

    A.    **Mason's Position and Terms of the STD Plan**

Mason began working at FedEx in 2006. Her job, at all relevant times, was handler/Non-DOT-Warehouse. (D.E. No. 13 at 228.)[1] Her job requirements included the "ability to lift 50 lbs. [and] to maneuver packages of any weight above 50 lbs. with appropriate equipment and/or assistance from another person." (Id.) Through at least July 31, 2019, Mason was a permanent full-time employee of FedEx and an Eligible Employee covered under its STD Plan. (D.E. No. 19-1 at 919; D.E. No. 13 at 857-58.)

The STD Plan (the "Plan") is a self-funded employee welfare benefit plan governed by the Employee Retirement Income Security Act ("ERISA"), 20 U.S.C. §§ 1001, et seq. (D.E. No. 19-1 at 919.) FedEx is the Administrator of the Plan, and Aetna is the Claims Paying Administrator. (D.E. No. 13 at 856 (STD Plan § 1.1).) The Plan empowers Aetna "to interpret the Plan's provisions in its sole and exclusive discretion . . . ." (Id. at 878 (STD Plan § 4.3(d).) Employees contact Aetna directly to initiate a claim for STD benefits. (D.E. No. 19-1 at 920.) If an STD benefits claim is denied, Aetna must communicate its decision to the employee, advise the employee of her right to appeal the denial,

---

[1] Unless otherwise noted, pin cites to record documents refer to the PageID page number.

and facilitate the appeal process through the Aetna Appeals Review Committee ("ARC"). (D.E No. 19-1 at 920.) FedEx is not involved in the benefit determination or appeal process. (Id.)

To qualify for STD benefits under the Plan, an employee must establish a "Disability." (D.E. No. 13 at 864 (STD Plan § 3.1).) To establish a Disability, the employee must have an "Occupational Disability," which is defined by the Plan as the "inability of a Covered Employee, because of a medically-determinable physical impairment or Mental Impairment, to perform the duties of [her] regular occupation." (Id. at 859 (STD Plan § 1.1.(s)).) The Disability must be "substantiated by significant objective findings, which are defined as signs which are noted on a test or medical exam and which are considered significant anatomical, physiological or psychological abnormalities which can be observed apart from the individual's symptoms." (Id. at 857 (STD Plan § 1.1(j)).) The Plan places the burden on its participants to substantiate an alleged Disability. (Id. at 874 (STD Plan § 4.1).)

Coverage under the Plan automatically terminates on the date an employee "ceases to meet the definition of an Eligible Employee . . . ." (Id. at 863 (STD Plan § 2.2(d)).) Under the terms of the Plan, "[A] Permanent Full-Time Employee who is on a personal leave of absence or an unapproved disability (for an illness or injury for which a claim for benefits has been denied

3

by the Claims Paying Administrator) shall not be an Eligible Employee unless the Employee is eligible for and approved for leave of absence under the Family Medical Leave Act of 1993 ('FMLA')." (Id. at 858 (STD Plan § 1.1(l).)

### B. Mason's Claims for STD Benefits

Mason's claims for STD benefits stem from a breast reduction surgery, subsequent complications, and revisional procedures. In 2016, Mason underwent bilateral reduction mammoplasty. (Id. at 148.) Since the surgery, she has experienced recurrent hypertrophic and keloid scar formation across her breasts and chest wall. (Id.) Mason has undergone additional surgeries and procedures to treat the tightness and pain allegedly caused by the scarring. (Id.)

On March 25, 2019, Mason underwent surgical excision of the scars on her chest wall, tissue rearrangement, and laser treatment on the scarring underneath her breasts. (Id. at 187.) Dr. Sai Velamuri, a board-certified plastic surgeon, performed those procedures. (Id.) His office notes from March 25, 2019, reflect the existence of both hypertrophic and keloid scar formation, but he does not offer any opinions about Mason's functional capacity or otherwise chart limitations or restrictions caused by the scarring. (Id.)

After the surgical excision and laser treatment, Dr. Holger Gieschen, a board-certified oncologist, administered several

4

consecutive rounds of radiation treatments to Plaintiff. (Id. at 145.) Dr. Gieschen had previously met with Mason on March 11, 2019, to discuss treatment options for Mason's scarring, including the postoperative radiation therapy Dr. Gieschen subsequently performed. (Id. at 148-50.) His notes from their initial March 11, 2019 meeting reflect that Mason presented with complaints of pain, tightness, and sporadic difficulty taking deep breaths, all of which she attributed to the scarring. (Id.) His notes also reflect a diagnosis of keloid scar formation along Mason's chest wall and breasts. (Id.) His records do not identify any limitations, restrictions, or functional impairment due to the scar formation or diagnosis. (Id.) He does not correlate his findings and diagnosis to any functional impairment claimed by Mason or otherwise opine that his diagnosis precludes Mason from performing her essential job functions. (Id.)

On March 26, 27, and 28, 2019, Dr. Gieschen successfully administered radiation treatments to Mason. (Id. at 154.) According to his treatment summary chart, Mason responded favorably to the treatment and did not experience any abnormal side effects or reactions. (Id.) Dr. Gieschen's chart reflects a pain score of 0/10 following treatment, a significant improvement from the 10/10 pain level that Mason had reported during her March 11, 2019 visit. (Id.) Dr. Gieschen did not

5

identify any limitations or restrictions on Mason's functionality in his treatment summary. (Id.)

On March 29, 2019, the day after her final radiation treatment, Mason met with Nurse Practitioner Jennifer Temple for a postoperative assessment. Nurse Practitioner Temple's notes reflect that Mason's "chest scars remain painful and hypertrophic," with worsening contracture to her sternal area. (Id. at 184.) On April 5, 2019, Mason returned for a follow-up visit with Nurse Practitioner Temple, where Mason presented with similar complaints of pain and tightness. (Id. at 179.) Nurse Practitioner Temple placed a temporary lifting restriction on Mason. Temple said that Mason was unable to lift more than five pounds and "need[ed] to remain in a clean, climate controlled environment." (Id.) Temple said that Mason's ability to function would likely improve by June 22, 2019. (Id.)

Over the following two months, Nurse Practitioner Temple continued to treat Mason and charted significant improvement in Mason's condition. Temple's office clinic notes from a May 23, 2019 appointment reflect that Mason's "sternal area [was] healing well," with no open areas, drainage, or infection. (Id. at 251.) Temple's notes also reflect that Dr. Velamuri was pleased with Mason's progress, that all incision sites had improved since the March 25, 2019 surgery, and that Mason's reported pain level was 0/10. (Id. at 252.) Temple's office notes from a June 20, 2019

6

appointment show similar improvement. (Id. at 239-40.) They reflect that the surgical sites in Mason's sternal area had fully healed and that no drainage, open areas, or infection had occurred. (Id.) Although Mason's scars still appeared hypertrophic, they continued to improve, as did Mason's pain, which she continued to deny. (Id.)

Dr. Velamuri recommended that Mason undergo another surgical excision in September 2019 to remove the remaining hypertrophic scarring. On August 22, 2019, Mason met with Dr. Velamuri for a pre-operative assessment that reflected continued improvement in Mason's scarring. (Id. at 219-21.) Although Dr. Velamuri's office notes reflect some levels of continuing hypertrophic scarring and intermittent pain, his notes confirm continued improvement of those symptoms since Mason underwent surgery in March 2019. (Id. at 219.) Dr. Velamuri's examination of Mason's surgical site did not reveal open areas, drainage, or infection. (Id.) Mason was charted as having a full range of motion, no complaints of pain, and no restrictions or limitations were placed on her functional capacity. (Id. at 220.)

On September 11, 2019, at the recommendation of Dr. Velamuri, Mason underwent another excisional surgery and laser treatment without complications. (Id. at 215.) On September 13, 2019, Mason met with Dr. Velamuri for a post-operative assessment. (Id. at 212.) For the first time since his initial

7

treatment of Mason, Dr. Velamuri opined that Mason should refrain from lifting her arms over her head, "as this could cause strain on the scars/incisions and cause them to reopen or worsen." (Id.) He placed no time limitation on this restriction. (Id.)

Also on September 13, 2019, Nurse Practitioner Temple wrote a patient letter asking that Mason be excused from work from July 31, 2019, to December 11, 2019. (Id. at 224.) As support, Temple's letter says that Mason "recently had multiple procedures, including excision and closures . . ., and that she must have sufficient time to heal . . . [or] the incisions may have complications." (Id.) Temple says that Mason has "restrictions of heavy lifting / no [lifting] greater than 5 pounds from 7/31/19 to 12/11/19." (Id.)

C.   **Aetna's Review of Mason's Claims**

Aetna initially approved Mason's claim for STD benefits for the period beginning April 1, 2019. (D.E. No. 19-1 at 924.) On September 4, 2019, Aetna denied Mason's claim for continued benefits beyond July 31, 2019, because she had failed to provide clinical data to substantiate a functional impairment that would preclude her from performing her work duties beyond July 31, 2019. (Id.)

Before making its decision, Aetna submitted Mason's medical documentation to an independent peer physician for review. (Id.) On August 20, 2019, Victor Atun, M.D., a board-certified plastic

8

surgeon, performed an initial physician peer review based, in part, on his complete review of all records of Mason's treating physicians that had been received as of August 2019. (D.E. No. 13 at 232.) After a recitation of the medical records, Dr. Atun opined that there was no "significant objective clinical documentation that reveals a functional impairment that would preclude this claimant from performing the essential duties of her occupation . . . from 7/31/2019 through 9/29/2019." (Id. at 235.) To support his opinion, Dr. Atun noted that, at the time of his analysis, there were no clinical notes for the period in question, i.e., 7/31/2019 to 9/29/2019. (Id. at 233.) He then opined that, although the tissue rearrangement performed by Dr. Velamuri covered a large area, the records did not reflect that the wound itself was large enough to justify the impairment Mason claimed. (Id. at 233-34.) Based on his review of the operative reports and office notes for March, May, and June, he opined that a three-week lifting restriction would have more appropriate following the March revisional procedures. (Id.)

On September 4, 2019, after reviewing all pertinent information, Aetna denied Mason's claim for STD benefits beyond July 31, 2019, and provided notice. (Id. at 291-92.) In its denial letter, Aetna explained that it had initially approved the claim through July 31, 2019, to allow Mason sufficient time for post-operative recovery from the March revisional

procedures. (Id.) Aetna explained that the clinical data and documentation that it had received to date did not substantiate a functional impairment that would entitle Mason to benefits beyond July 31, 2019. (Id.) Aetna relied on the office notes of Mason's treating physicians, particularly those from June 2019, which reflected Mason's decreased levels of pain, consistent wound healing, and full range of motion. (Id.) Aetna also relied on the report of Dr. Atun, concluding that there were insufficient objective findings of a continued functional impairment beyond July 31, 2019. (Id.)

Mason timely appealed Aetna's decision. She submitted additional documentation to support her claim for continued benefits, including Nurse Practitioner Temple's Attending Physician Statement, patient letters, and office notes covering treatment through September 13, 2019. (D.E. No. 19-1 at 925.) There is no evidence in the Administrative Record or pleadings that Mason returned to work or obtained FMLA leave after Aetna denied her application for STD benefits.

After receiving those additional records, Aetna submitted for review all the updated medical records to a second peer physician, John A. Dean. (D.E. No. 13 at 170-75.) In his first report, Dr. Dean, a board-certified plastic surgeon, listed the various records that he had reviewed, which covered the September revisional procedures performed by Dr. Velamuri after Aetna's

initial denial. (Id.) Dr. Dean also discussed Mason's treatment with a nurse in Dr. Velamuri's office. (Id.)

Dr. Dean concluded that there were no significant objective criteria to show a functional impairment that would preclude Mason from performing essential duties beyond July 31, 2019. (Id.) Dr. Dean noted that Mason had not demonstrated any significant pain beyond July 2019, had no limitation of motion, and had not experienced prior skin healing problems. (Id.) The medical records and Dr. Dean's discussion with Mason's healthcare provider showed that Mason had significant improvement after her treatments. A lifting restriction was only necessary in the two weeks following the September procedures. (Id.) Dr. Dean acknowledged and rejected the opinions of Dr. Velamuri and Nurse Practitioner Temple about the extended lifting restriction. (Id.)

A month after Dr. Dean's initial report, Aetna received additional documentation from Mason, including Dr. Gieschen's office notes and treatment summaries and Temple's patient letters. (Id. at 129-132.) Aetna asked Dr. Dean to provide a supplemental report following his review. (Id.) On November 18, 2019, after reviewing the additional records, Dr. Dean again concluded that Mason had failed to substantiate her alleged disability. (Id.) Dr. Dean again acknowledged and rejected the

rationale for the lifting restrictions imposed by Nurse
Practitioner Temple, stating:

> The reason that [Temple] is giving to justify having
> the claimant take off additional time from work is to
> avoid stress on the scars for fear the scar formation
> may worsen . . . . [Mason's] problem is with excessive
> scar formation, not weak scar formation. Weak scar
> formation may be influenced by excessive tension on
> scars due to heavy workload. By July 8, 2019, all scars
> were solidly (and excessively) healed and should not
> be negatively affected by heavy work.

(Id. at 131.)

Aetna next submitted Mason's records to two additional peer
review physicians, Gregg Goldin, M.D. and Jamie L. Lewis, M.D.
Dr. Goldin, a board-certified radiologist, opined that Mason's
radiation treatments would not impact her overall functional
capacity. (Id. at 109-114.) Dr. Goldin concluded that, based on
Mason's job description, no significant objective clinical
documentation revealed functional impairment to preclude her
from performing the essential duties of her occupation from July
8, 2019, through the present. (Id.)

Dr. Lewis, a physical medicine and rehabilitation/pain
specialist, reached the same conclusion, noting that Mason's
physical examinations revealed no limited range of motion,
delayed healing, or motor weakness that would substantiate the
claimed disability. (Id. at 90-96.) Dr. Lewis stated that Mason
was not functionally impaired, would not require specific
restrictions and limitations, and ultimately concluded that

there were no significant objective findings to substantiate impairment in functional capacity beyond August 1, 2019. (Id.)

On February 17, 2020 the ARC considered Mason's appeal. (Id. at 36-40.) The ARC reviewed all medical documentation Mason submitted, including the updated records evidencing the treatment, procedures, and limitations rendered and imposed by her treating healthcare providers in September and October 2019, as well as all five physician peer reviews. (Id.) In upholding the denial of Mason's claim, the ARC determined there were no significant objective findings to substantiate the existence of a qualifying functional impairment beyond July 31, 2019. (Id.) The ARC provided detailed summaries of the medical records, treatments, and Mason's progress. (Id.) It further acknowledged and rejected the justification for the restrictions and limitations imposed by Mason's treating physicians, adopting instead the analysis and conclusions reached by the numerous peer review physicians. (Id.) The ARC denied Mason's claim. (Id.)

## II.  Jurisdiction

The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331. Questions presented by ERISA arise under the laws of the United States.

## III. Standard of Review

"Because the role of a district court in ERISA matters is not to determine whether issues of fact exist for trial, but to

13

review the administrative record before it, district courts should more properly characterize their role in such proceedings as encompassing elements of both bench trials and summary judgments." See Jensen v. Aetna Life Ins. Co., 32 F. Supp. 3d 894, 897 (W.D. Tenn. 2014) (quoting Gibson v. Prudential Ins. Co. of Am., 513 F. Supp. 2d 950, 956 (E.D. Tenn. 2007)); see also Wilkins v. Baptist Healthcare Systems, Inc., 150 F.3d 609, 617-620 (6th Cir. 1998) (Gilman, J., concurring) (explaining that the adjudication of ERISA cases requires an approach not defined by either the bench trial or summary judgment standard).

A denial of ERISA benefits is "to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). When the administrator has discretionary authority, as Aetna does in the present case, its decision is reviewed under the arbitrary-and-capricious standard. See Jackson v. Blue Cross Blue Shield of Michigan Long Term Disability Program, 761 F. App'x 539, 543 (6th Cir. 2019). "Despite this deferential standard, however, [a court's] review is no mere formality . . . . Instead, [it is] required to review 'the quality and quantity of the medical evidence and the opinions on both sides of the issues.'" Glenn v. MetLife, 461 F.3d 660, 666 (6th Cir. 2006) (aff'd, 554 U.S.

105 (2008)) (quoting <u>McDonald v. Western-Southern Life Ins. Co.</u>, 347 F.3d 161, 172 (6th Cir. 2003)).

## IV.  Analysis

ERISA plans are products of their drafting. A plan's requirements bind participants. <u>See</u> <u>Cooper v. Life Ins. Co. of N.Am.</u>*,* 486 F.3d 157, 166 (6th Cir. 2007). Courts are bound by plan specifications, and administrators have discretion to interpret those provisions. <u>See</u> <u>Curry v. Eaton Corp.</u>*,* 400 Fed. Appx. 51, 66 (6th Cir. 2010).

Under the arbitrary-and-capricious standard, courts must uphold the administrator's denial of benefits if it is "the result of a deliberate, principled reasoning process" and "supported by substantial evidence." <u>DeLisle v. Sun Life Assur. Co. of Canada</u>*,* 558 F.3d 440, 444 (6th Cir. 2009) (quoting <u>Glenn</u>*,* 461 F.3d at 666). "[W]hen a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision." <u>See</u> <u>Jackson</u>, 761 F. App'x at 545 (quoting <u>McDonald</u>, 347 F.3d 161, 169). However, as part of the arbitrary-and-capricious analysis, courts may consider whether the administrator "ignored favorable evidence submitted

by [plaintiff's] treating physicians, selectively reviewed the evidence it did consider from the treating physicians, failed to conduct its own physical examination, and heavily relied on non-treating physicians." Shaw v. AT&T Umbrella Ben. Plan No. 1, 795 F.3d 538, 547 (6th Cir. 2015).

Mason argues that Aetna's denial of STD benefits after July 31, 2019 was arbitrary and capricious. (D.E. No. 18 at 910.) She contends that Aetna did not properly consider the limitations placed by her treating healthcare providers and instead relied entirely on the opinions of doctors who had not examined or spoken with her. (D.E. No. 18. at 912.) Mason argues that the scar tissue remaining after her procedures is an objective finding that substantiates her claim for STD benefits. (Id.) FedEx argues that the review of Mason's claim was not arbitrary and capricious. (D.E. No. 19 at 929.) It argues that Aetna did consider the records submitted by Mason's treating physicians and that the reliance on non-treating physicians did not render its decision arbitrary and capricious. (Id. at 930-31.)

The Administrative Record contains substantial evidence supporting Aetna's denial of Mason's STD claim. Its denial was not arbitrary and capricious.

### A. Mason's Healthcare Providers

Treatment notes from Mason's healthcare providers do not clearly establish that Mason qualified for an extension of

16

benefits beyond July 31, 2019. Before the March revisional
procedures, treatment notes entered by Dr. Velamuri and Dr.
Gieschen fail to show any limitation, restriction, or functional
impairment caused by the original scarring. (D.E. No. 13 at 187-
89, 148-50.) After the procedures, treatment notes entered by
Nurse Practitioner Temple recommend a five-pound lifting
restriction. (Id. at 179.) However, the same notes also reflect
an expected recovery date of June 22, 2019. (Id.) It does not
appear that Temple intended the initial restriction to last
beyond a brief recovery period. By June 20, 2019, Temple's office
notes reflect that Mason's surgical sites had fully healed and
do not show a continued restriction that would qualify as a
Disability under the Plan. (Id. at 239-40.)

That Dr. Velamuri performed a second revisional surgery in
early September 2019 also suggests that Mason did not meet the
Disability definition beyond July 31, 2019. Dr. Velamuri's pre-
operative assessment from August 22, 2019, reflects some levels
of continued scarring and pain, but confirms improvement of these
symptoms since the March operations. (Id. at 219-21.) The August
22 assessment also shows that Mason had a full range of motion
and does not reflect any restrictions or limitations her
functional capacity (Id.)

The notes entered after the September 2019 revisional
procedures do not adequately support the continuation of benefits

17

beyond July 31, 2019.  It is not clear that Dr. Velamuri intended his September 13th lifting restriction to extend back to July 31. Dr. Velamuri's notes are also ambiguous about the purpose of the restriction – wound healing or long-term prevention of hypertrophic and keloid scar formation. (Id. at 212.) Nurse Practitioner Temple's September 13th lifting restriction, retroactively dated to July 31, is not entitled to significant weight. Temple's June 20th notes reflect that Mason had fully recovered from the March revisional procedures. (Id. at 239.) The retroactive restriction appears to be an attempt to justify Mason's absence from work after July 31, 2019, and preserve Mason's coverage under the Plan.

**B.   Aetna's Reviewing Physicians**

Aetna's reviewing physicians consistently found that the documentation provided by Mason did not support the extension of benefits beyond July 31, 2019. It was reasonable for Aetna to rely on the medical opinions of those doctors. Aetna's first reviewing physician, plastic surgeon Dr. Victor Atun, found "no significant objective clinical documentation that would preclude [Mason] from performing the essential duties of her occupation . . . from 7/31/2019 through 9/19/2019." (Id. at 235.) He found that a three-week lifting restriction after the first revisional procedures would have been more appropriate. (Id.) Dr. Atun

reached those conclusions after his review of the records of Mason's treating physicians. (Id. at 232.)

Aetna's second reviewer, plastic surgeon Dr. John A. Dean, also concluded that there were not significant objective criteria to show a functional impairment beyond July 31, 2019. (Id. at 170-75.) Mason had not demonstrated pain beyond July 2019, had no limitation of motion, and had not previously experienced problems healing after surgery. (Id.) Dr. Dean made those findings based on a review of Mason's treatment records and a discussion with Dr. Velamuri's office. (Id.) Dr. Dean provided a supplemental report after Aetna received additional documentation and again concluded that Mason had failed to substantiate her disability. (Id. at 129-132)

Two additional peer review physicians, Gregg Golding, M.D. (Radiology) and Jamie L. Lewis, M.D. (Physical Medicine & Rehabilitation/Pain) reached the same conclusion. Dr. Golding concluded that no significant objective clinical documentation revealed functional impairment beyond July 8, 2019. (Id. at 109-14.) Dr. Lewis noted that Mason's physical examination revealed no limited range of motion, delayed healing, or motor weakness that would substantiate the claimed disability. (Id. at 90-96.) He concluded that there were no significant objective findings to substantiate impairment in functional capacity beyond August 1, 2019. (Id.)

19

As part of Mason's appeal, the ARC considered all medical evidence Mason submitted as well as the five physician peer reviews. (Id. at 36-40.) It acknowledged and rejected the justification for the restrictions and limitations imposed by Mason's treating physicians, adopting instead the analysis and conclusions reach by the peer review physicians. (Id.)

Mason's criticism of Aetna's claims process is not well taken. The Administrative Record demonstrates that Aetna's reviewing physicians did not ignore or selectively review the evidence that Mason's treating physicians submitted. The reviewing physicians were aware of the scarring that remained after Mason's various procedures and the restrictions recommended by Mason's treating healthcare providers. The reviewing physicians found that the submitted evidence did not support Mason's claim for extended disability benefits. They expressly addressed and rejected the reasons offered for Mason's limitations. The ARC also reviewed the evidence submitted by Mason's treating physicians. The ARC's ultimate denial of Mason's claim is not rendered arbitrary and capricious by the fact that it chose to credit the reviewing physicians over Mason's treating healthcare providers. See Jackson, 761 F. App'x at 545.

Aetna's file-only review also does not render its denial of benefits arbitrary and capricious. The Sixth Circuit has found that a file-only review "raise[s] questions" about the

thoroughness and accuracy of the benefits determination where the file reviewer "concludes that the claimant is not credible" or where the administrator, "without any reasoning, credits the file reviewer's opinion over that of a treating physician." See Judge v. Metro. Life Ins. Co., 710 F.3d 651, 663 (6th Cir. 2013). Aetna's reviewing physicians based their conclusions on objective evidence, such as Mason's reported pain, mobility, and healing history, as opposed to credibility determinations. They expressly addressed and rejected the reasons offered for Mason's limitations. As discussed above, the notes from Mason's healthcare providers did not provide significant objective evidence to support Mason's claim for extended disability. In this instance, Aetna's file-only review does not suggest that its denial of Mason's claim was arbitrary and capricious.

## C.  Disabilities Arising After Aetna's Denial

On September 4, 2019, Aetna denied an extension of Mason's STD benefits from July 31, 2019, to December 11, 2019. On September 11, 2019, Mason underwent a second round of revisional procedures. Dr. Dean, one of Aetna's reviewing physicians, noted that those procedures would likely require a two-week recovery period. (D.E. No. 13 at 136.) The Court cannot award STD benefits for this acknowledged recovery period. Under the terms of the Plan, an employee on unapproved disability automatically loses coverage unless she obtains an approved leave of absence under

21

the FMLA.  (Id. at 858.) Mason was on unapproved disability as of July 31, 2019. There is no indication that she obtained approval for FMLA leave.  She has not established coverage under the Plan at the time of the second revisional procedures and is not entitled to benefits related to her recovery.

**V.   Conclusion**

For the foregoing reasons, FedEx's Motion for Summary Judgment is **GRANTED**. Mason's Motion for Judgment on the Administrative Record is **DENIED**.


SO ORDERED this 15th day of September, 2021.


*/s/ Samuel H. Mays, Jr.*
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE